UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DERWIN SALTERS,

                Plaintiff,

          -against-

NEW YORK CITY TRANSIT AUTHORITY,
JEAN L. ANDRE,

                Defendants.
------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
21-CV-04836 (OEM) (JRC)

ORELIA E. MERCHANT, United States District Judge:

At the conclusion of a six-day jury trial held from February 10, 2025, to February 18, 2025, the jury rejected Plaintiff Derwin Salters' ("Plaintiff") claims that defendants New York City Transit Authority ("NYCTA") and former NYCTA bus driver Jean L. Andre ("Andre") ("Defendants") negligently caused him to sustain personal injuries as a result of a collision between Plaintiff's rental car and the NYCTA articulated bus driven by Andre on February 3, 2021, near the intersection of Nostrand Avenue and Kings Highway in Brooklyn, New York. Jury Verdict Sheet, ECF 70. On February 18, 2025, following the jury's verdict finding Defendants not liable, the Court entered a final judgment in favor of Defendants and against Plaintiff. Judgment, ECF 73.

Before the Court is Plaintiff's fully briefed motion pursuant to Federal Rule of Civil Procedure 59(a)(1)(A) seeking an order vacating the Judgment and for a new trial.[1] For the following reasons, Plaintiff's Motion is denied.

---

[1] Plaintiff Notice of Motion for New Trial ("Pl.'s Motion"), ECF 75; Declaration of Caner Demirayak, ECF 76; Excerpts of Trial Transcript, ECF 76-1; Memorandum of Law in Support of Plaintiff's Motion ("Pl.'s MOL"), ECF 77; Defendants' Response in Opposition ("Defs.' Opp."), ECF 81; Plaintiff's Reply ("Pl.'s Reply), ECF 82.

## RELEVANT BACKGROUND

### A.    Jury Selection

On the parties' consent, Magistrate Judge Lara Eshkenazi ("Magistrate Judge") presided over jury selection.  Transcript of Trial Proceeding ("Tr.") at 6:4-10, ECF 79.  After Defendants exercised their peremptory challenges on three minority panelists, Plaintiff's counsel orally raised a *Batson* challenge on the basis that Defendants' counsel "ha[d] chosen to exclude three persons of black skin color."  *Id.* at 70:5-73:2.  Plaintiff's counsel provided the name and assigned number of the three prospective jurors, stating that they are "all of black skin color."  *Id.* at 73:3-7.

The Magistrate Judge asked Defendants' counsel if he was "able to provide a race neutral reason why [he] struck those [three panelists]."  *Id.* at 74:13-15.  Defendants' counsel responded that he "[h]onestly didn't even look at the race to know why.  I have to go back to my notes."  *Id.* at 74:16-18.  He then stated that one of the panelists "seemed to be very simply educated, not knowing if she would fully be able to comprehend all expert testimony," *id.* at 74:20-22; another panelist is a "home health aide" and therefore could have "sympathy toward dealing with individuals who may be disabled, elderly, things of that nature," *id.* at 74:25-75:2; and the other panelist "just seemed a little out of it, not being able to comprehend all the evidence that was going to come in" and "[h]e said he's very philosophical," *Id.* at 75:4-9.  Defendants' counsel stated: "Nothing whatsoever to do with race."  *Id.* at 75:9

Plaintiff's counsel responded that "[t]hose explanations are a pretext for racial bias."  *Id.* at 75:10-12 (that one of the panelists was out of it and the "analysis as to why it was ok to remove [the other panelist] is that she's a simple-minded person").  The Magistrate Judge corrected Plaintiff's counsel regarding this mischaracterization of the words used by Defendants' counsel. *Id.* at 7514-16.  Plaintiff's counsel also argued that Plaintiff Salters and Defendant Andre are

"black, same color" but that the "jury is mostly not black" and therefore "this is a complete jury that violates the *Batson* rule" and the three stricken panelists "needed to be reinstated and to be put on the jury." *Id.* at 75:17-76:2.

The Magistrate Judge overruled the *Batson* challenge, stating that she did not believe Defendants' counsel struck the jurors because they were black and that he had "articulate[d] race neutral reasons" for doing so. *Id.* at 76:3-7. Further, Magistrate Judge noted that "there are two black members who will still be on the jury." *Id.* Plaintiff's counsel responded that the "jury is overwhelmingly not black and [he] think[s] that was designed by the defendant on purpose." *Id.* at 76:8-10. Defendants' counsel took exception with that insinuation, noting his objection, and the Magistrate Judge completed jury selection. *Id.* at 76:11-25.

## B.     Evidence Presented at Trial[2]

The accident occurred on February 3, 2021, at approximately 1:47 p.m. on Nostrand Avenue near its intersection with Kings Highway. Nostrand Avenue is a two-way street divided by an emergency lane, with one lane of travel and one parking lane in each direction. The bus stop is located on the right side of Nostrand Avenue at the corner with Kings Highway.

During the trial, the jury heard testimony from three fact witnesses (Plaintiff Salters, Defendant Andre, and NYCTA supervisor Cesario Vasto, Andre's supervisor at the time of the accident) and four expert witnesses (Dr. Rick Sides, an independent chiropractor that examined

---

[2] To the extent that Plaintiff's motion for a new trial is based on his position that the jury's verdict was against the weight of the evidence, Plaintiff focuses solely on the issue of liability—whether Defendants were negligent in causing the accident. As such, for purposes of its analysis on this issue, the Court does not provide a full recitation of the facts adduced at trial, but instead, focusses on facts adduced at trial on the issue of liability as challenged by Plaintiff.

Salters; Dr. Andrew Cordiale, Salters' treating spinal surgeon; Brendan McLaughlin, a mechanical engineer and accident reconstructionist; and Aman Gupta, a biochemical engineer).

### 1.    The Video Recording of the Accident

At trial, the parties played for the jury a video recording that captured the accident, using the same exhibit – Defendants' Exhibit A ("DTX A").  The recording was from security cameras inside the articulated bus.  The cameras showed nine angles and viewpoints: inside of the bus from the front to the back of the bus; an angle focused solely on Andre; the exit doors; the front of the bus; and others on both sides of the bus.  *Id.*  The video showed that Andre's bus arrived at the bus stop, but the bus did not pull into the bus stop lane.  *Id.*  The sidewalk and bus lane were partially obstructed by snowbank, but it was not snowing that day.  *Id.*  The bus remained in between the travelling lane and bus stop lane while servicing the bus stop.  *Id.*  As passengers were getting in and out of the bus, the video showed that Plaintiff Salters drove up on the left side of bus in the emergency lane and stopped mid-way in parallel to the bus, and at one point Plaintiff's car is barely visible in the video.  *Id.*  The video showed that after servicing the bus stop, Andre proceeded to slowly drive in a straightforward manner, and that Andre slightly straightened the steering wheel.  *Id.*  As the bus began to move forward, Plaintiff's car re-appeared in the video where it was at that point in a diagonal position towards the bus.  *Id.*  The video showed that as the rear of the bus passed Plaintiff's car, the vehicles collided, with the front bumper of Plaintiff's car coming off.  *Id.*  The video also showed that the collision made Plaintiff's car slowly return to a parallel position vis-à-vis the bus.  *Id.*

### 2.    Salters' Testimony

Plaintiff Salters testified at trial.  As for his recount of the accident, Salters testified that he drove up next to the stopped bus on the emergency lane, attempting to turn right onto Kings

Highway.  However, Plaintiff stopped mid-way and couldn't turn because the traffic light was broken and the bus was in his blind spot.  *See* Tr. 87:3-6, ECF 85.  He was therefore "waiting for [the bus] to pull off so [he] could turn."  *Id.* at 171:22-23.  Plaintiff testified that his right foot was "on the brake" at all times and that he never moved the car before the accident happened.  *Id.* at 126:3-16; 129:8-9.  According to Plaintiff, the bus had stopped "5 feet away from the curve [and] that's how [Plaintiff] wound up on that side of the bus like that."  *Id.* at 86:3-16.  He also testified that there was a lot of snow on the sidewalk and on the curb, consistent with the video and Andre's testimony.  *Id.* at 85: 15-17.  He also testified that there "was enough [space] for me to stay on the other side of the lane so [the bus] won't hit me so I won't be in [the bus'] way."  *Id.* at 86:24-87-1.

Plaintiff testified that prior to the accident the left rear-end bumper of the bus was broken and was "hanging off" like a "hook."  According to Plaintiff, as the bus began moving forward, the hook "grabbed the front of my bumper on my car, and that's how the accident [happened]."  *Id.* at 81:25-82:6; 82:12-83:10.  Plaintiff testified that his steering wheel turned when the hook dragged his car.  *Id.* at 172:19-23.  The bumper of the bus "lifted [his car] up, shook [him] around, and that's how I hurt my head, my neck, and my elbow, and that's on the right side of my back from the seatbelt."  *Id.* at 83:6-10.  In describing how he experienced the collision from inside his car, Plaintiff testified that "it hit me, like I said, went in the air.  It sprung.  The shocks of the car [-] they just make me jump and drag me.  I hit my head on the roof.  My arm came down on the arm rest and the side of my back was hit by the belt."  *Id.* 129:15-18.

After describing the accident, Plaintiff was shown the video of the accident on direct and cross examination.  On direct examination, Plaintiff testified that the video shows that it appears that "his car ran into the bus" but that the "bus pulled [him] into it" *id.* at 126:22; that the video

does not show his "car getting dragged by the bus because it doesn't show the bumper" "hanging on the back of the bus," *id.* at 128:10-18; and that because the video is from the vintage point of the bus moving forward, it appears that his car is moving but his car wasn't "moving at all," *id.* at 129:4-7.

On cross examination, Plaintiff testified that the video showed that his car drove next to the bus on the emergency lane and that the wheels were "facing straight forward." *Id.* at 223:4-15. Plaintiff was shown the clips of the video where his car was in a parallel position when it initially stopped next to the bus and his car in a diagonal position right before the impact. Plaintiff testified that he disagreed that his car was not in a diagonal position when he first stopped. *Id.* at 220:2-223:25. When showed the video of his car at a diagonal angle, Plaintiff testified that his car was already at that angle. *Id.* at 224:1-4. Plaintiff agreed that the video did not show his car going up in the air as he had previously testified on direct examination.[3] *Id.* at 232:3-9.

On re-direct, Salters testified that the video "didn't show a lot of stuff." *Id.* at 261:2-5. He provided the following testimony:

Q. What does the video show as to your vehicle at all times?
A. The video shows that it's my fault all the way through, man."

*Id.* at 265:4-7. Further, Plaintiff responded as follows:

Q. Would you say that your action in putting your vehicle there partially caused the accident?
A. Yes. Put it like this, I'm going to say it's the bus's fault. If I wouldn't have moved there, yeah, I'm partially at fault. Common sense, yeah, I shouldn't have been there.

---

[3] During Defendants' cross-examination of Plaintiff, Plaintiff's counsel requested a recess. The Court excused the jury for a break. Outside of the jury's presence, Plaintiff's counsel asked to "speak with [the Court] about possibly resolving this matter" through settlement. *Id.* at 232:11-233:8. Discussions were held off the record. *Id.* The trial resumed thereafter. *Id.* at 233:11-18.

*Id.* 270-13-15.

When shown a picture that Plaintiff took after the accident of the left rear end bumper of the bus, Plaintiff testified the bumper was hanging off prior to the accident. *Id.* 203:1-16 (Plaintiff shown Plaintiff's Exhibit 6, a picture taken by Plaintiff after the accident of the left rear end bumper of the bus)

### 3.     Andre's Testimony

Following Salters' testimony, Andre took the stand the next day, on February 12, 2025. Andre testified that he had been a bus operator with NYCTA for 19 years at the time of the accident. Tr. 373:8-10, ECF 86. On the day of the accident, Andre relieved another bus operator of the articulated bus and began his shift at approximately 10:30 a.m. *Id.* at 373:16-17. Before he began operating the bus, Andre testified that he inspected the 60-foot long articulated bus by walking around it to make sure nothing was loose. He inspected all four bumpers of the bus by manually kicking it to see if everything was secure. *Id.* at 319:19-320:20. Andre testified that he would not have operated the bus if he had seen the bus bumper as shown on PTX 6A during his inspection. Andre testified that the rear end "bus bumper was not ben[t]. Period. I inspected the bus." *Id.* at 321:1-2.

Andre testified that he did not pull into the bus stop lane that day because of the snowbank and "the rules state that if a bus stop is blocked or unsafe, the bus operator must ensure that every passenger, customers, get out of the bus safely. *Id.* at 324:24-325:5. "That's the rule" even if the bus is obstructing traffic. *Id.*; *see id.* at 325:7-14. The traffic regulations usually require buses to be 12 inches (one foot) away from the curb. *Id.* at 326:12-22. Andre testified that the articulated bus was "straight" in the traveling lane and was about 4 feet from the curb.

After he serviced the bus stop, Andre testified that he started driving the bus at the speed of approximately three miles per hour and that Plaintiff's car was at a complete stop in the emergency lane. *Id.* at 322:1-5. Andre testified that although the video shows that his hands turned the steering wheel, "that was not a turn" but rather that he was "straightening up" the wheels. *Id.* at 368:6-7. He testified that he checked the gap between the bus and Salters' car before proceeding and noticed that the gap was approximately 3 feet. *Id.* at 337:13-14. His first indication that he was involved in a crash was when he saw from scanning his left side mirror Salters' car close to the articulation of the bus, which he said was turning right into the bus while he was "pulling straight, slow, and straightforward." *Id.*; 333:3-8.

This was inconsistent with the incident report that Andre completed on the day of the accident, where Andre wrote that the first time he knew he was in an accident was when he "heard a cracking noise in the rear of the bus." *Id.* at 327:19-22; 330:15-19 (Andre reading from the incident report). He did not write in the report that he witnessed the crash and he also did not write that Plaintiff's car had made a right turn into the rear of the bus. *Id.* at 331:1-2; 332:23-333:1. Plaintiff counsel elicited the following testimony on cross examination:

> Q. Did you say you were rear-ended by a fast car going too fast because you did not see the other car before the crash?
> A. I called a rear end accident as such.
> THE COURT: Sir, the question is: Did you say you were rear ended by a fast car going too fast because you did not see the other car before the crash.
> THE WITNESS: Yes.

*Id.* at 369:11-17. Andre testified that both could be true: that he saw the accident and heard a cracking noise. *Id.* at 334:1.

Andre also provided the following testimony:

> Q. The other vehicle is two to 3 feet away, away from yours, you're pulling out straight, you don't turn your wheel, you're going 3 miles an hour, he's going a speed

> you don't know.  And it's your testimony that this collision happened only because
> he turned right into your bus?
> A. Yes, positive.
> Q. Nothing else had a role in bridging that two to 3 feet gap?
> A. To the best of my knowledge, no.

*Id.* at 337:21-338:4.

> Q. Sir, you were present yesterday for Mr. Salters' testimony?
> A. I was here.
> Q. And did you hear when he testified that he probably shouldn't have been where
> he stopped his car before the incident. You heard that?
> A. I did.
> Q. Did you hear where he admitted to the jury that he's partially responsible for the
> accident?
> A. I heard it too.
> Q. Will you also admit that you're partially responsible?
> A. None.

*Id.* at 344:9-20.

## C.    The Parties' Motions During Trial

During Plaintiff's case in chief, Plaintiff's counsel orally moved for a mistrial at the

conclusion of the second day of trial.  Tr. 293:12-295:18.  The next day, the Court denied that

motion. Tr. 300:9-304:24, ECF 86.  Plaintiff's counsel then immediately moved for recusal of the

undersigned.  *Id.* at 305:7-306:3; 307:11-310:4. The Court denied that motion as well.  *Id.* at 310:9-

311:16.

At the close of evidence in Plaintiff's case, Defendants moved for directed verdict, and the

Court reserved decision.  Tr. 634:10-16, 639:12-13, ECF 87.

## D.    Jury's Verdict and Post-Trial

On February 18, 2025, after hearing testimony for six days and deliberating for less than

two hours, the jury reached a verdict in favor of Defendants.

After the jury was discharged, Plaintiff stated that he intended on filing a motion that the

jury's verdict was against the weight of the evidence under Federal Rules of Civil Procedure 50

and 59.  The Court explained to Plaintiff that Rule 50 would not be the proper vehicle for that motion because Plaintiff had not previously moved for judgment as a matter of law before the case was submitted to the jury, as required by Rule 50(b), but that the Court would allow Plaintiff to file any post-trial motions that Plaintiff may be entitled to under the Federal Rules.

After the jury verdict, on the date that the trial concluded, Plaintiff filed a notice of appeal to the Second Circuit, Notice of Appeal, ECF 74, and on March 18, 2025, Plaintiff filed the instant motion to vacate the judgment and for a new trial in this Court.

## LEGAL STANDARD

Plaintiff's motion for a new trial invokes Federal Rule of Civil Procedure 59(a)(1)(A). Under Rule 59(a)(1)(A), a district "court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action in law in federal court." FED. R. CIV. P. 59(a)(1)(A).  While the "drafters of the rules [did not] enumerate all the grounds for a new trial," 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2805 (3d ed. supp. Apr. 2025), courts have interpreted this standard to permit the granting of new trials when "(1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive," *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 174 (E.D.N.Y. 2012).  Such a motion "may be granted even if there is substantial evidence supporting the jury's verdict."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). A court that evaluates such a motion is "free to weigh the evidence itself, and need not view it in the light most favorable to the verdict winner," but is cautioned to "rarely disturb a jury's

evaluation of a witness's credibility" and "should only grant such a motion when the jury's verdict is egregious." *Id.*

Granting a new trial "is an extraordinary relief." *Welch*, 871 F. Supp. 2d at 174. And rulings on such motions "are committed to the sound discretion of the district court." *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013). "The Second Circuit has instructed district courts to 'abstain from interfering with [a jury] verdict unless it is quite clear that the jury has reached a seriously erroneous result' that would result in 'a miscarriage of justice.'" *Fioto v. Manhattan Woods Golf Enter., LLC.*, 304 F. Supp. 2d 541, 545-546 (S.D.N.Y. 2004) (citing *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978)); *Lundstedt v. JP Morgan Chase Bank, N.A.*, 853 F. App'x 704, 709 (2d Cir. 2021) (holding that granting new trial "is warranted 'only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice"); *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 82 (2d Cir.2006) (holding that a Rule 59 motion for a new trial "ordinarily should not be granted, unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice"). More generally, a "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite of the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).

## DISCUSSION

Plaintiff asserts he should be granted a new trial on two grounds: (1) Defendants committed a *Batson* violation by exercising peremptory strikes to exclude three black panelists and the Magistrate Judge erred in overruling his challenge, Pl.'s MOL at 5-6; and (2) the jury's verdict was against the weight of the evidence presented at trial, *id.* at 6-7. Aside from an exhibit containing excerpts from the trial transcript, *see* ECF 76-1, Plaintiff has failed to support his

arguments with any citations to particular parts of the trial transcripts in his memorandum of law, and Plaintiff's curated excerpts do not provide a complete record of testimony relevant to Plaintiff's argument that the jury's verdict was against the weight of the evidence, leaving the Court to comb through the entire trial record to find the relevant testimony at issue for consideration to evaluate Plaintiff's arguments and the law. Failure of a party moving for new trial to cite or refer to relevant trial transcript may alone warrant denial of motion for a new trial. *See Hilt Constr. & Mgmt. Corp. v. Permanent Mission of Chad to United Nations in New York*, 16-CV-6421 (VB), 2019 WL 5260829, at *2 (S.D.N.Y. Oct. 16, 2019); *AMW Materials Testing, Inc. v. Town of Babylon*, 01-CV-4245 (ADS) (ETB), 2008 WL 11449231, at *18 (E.D.N.Y. Mar. 13, 2008) ("[U]nsupported contentions, without any evidence cited from the trial transcript, are insufficient to justify the grant of a new trial."). However, in this case, the Court addresses Plaintiff's arguments on the merits based on its own review of the record.

## A.    Plaintiff's *Batson* Challenge Does Not Warrant a New Trial

The *Batson* rule prohibits a party from using its peremptory challenges to exclude potential jurors solely based on their race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (holding that the Equal Protection Clause prohibits challenging jurors solely based on their race); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628 (extending *Batson*'s holding to civil cases). A party who believes that the other party violated the *Batson* rule must raise a timely *Batson* challenge. To rule on a *Batson* challenge, a court must engage in a three-part burden-shifting analysis. *Messiah v. Duncan*, 435 F.3d 186, 194 (2d Cir. 2006).

To establish a *Batson* violation, "[f]irst, a [movant] must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the [proponent] must offer a race-neutral basis for striking the juror in question; and third,

in light of the parties' submissions, the trial court must determine whether the [movant] has shown purposeful discrimination." *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)); *Rowell v. Ferreira*, 830 F. App'x 698, 699 (2d Cir. 2020). At the final step of the inquiry, "[t]he trial judge must determine whether the [proponent's] proffered reasons are the actual reasons [for the strike], or whether the proffered reasons are pretextual and the [proponent] instead exercised peremptory strikes on the basis of race." *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019). "The trial court must consider the [proponent's] race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *Id.* at 302. Because a trial court's finding as to the intent underlying the use of a peremptory challenge rests principally upon a credibility assessment that lies "peculiarly within a trial judge's province," that determination is entitled to "great deference" and is reviewed only for clear error. *Rowell v. Ferreira*, 830 F. App'x 698, 700 (2d Cir. 2020) (summary order) (quoting *Flowers*, 588 U.S. at 303).

Plaintiff is not entitled to a new trial on the theory that there was a *Batson* violation. After Plaintiff raised a *Batson* issue based on a potentially discriminatory pattern in Defendants' peremptory strikes of three black panelists, the Magistrate Judge required Defendants' counsel to offer race-neutral explanations for the challenged peremptory strikes. Therefore, the Magistrate Judge "met [her] obligations under *Batson* steps one and two." *Galarza v. Keane*, 252 F.3d 630, 639 (2d Cir. 2001). Defendants' counsel proffered race neutral explanations regarding each of the prospective jurors at issue based on his impressions of their responses to voir dire questions: that two of them may have difficulty grasping all the evidence and that the third may have sympathy for Plaintiff. The decision to exercise a peremptory challenge "may legitimately be based not only on answers given by the prospective juror[s] to questions posed on voir dire, but also on the

[attorney's] observations of the prospective juror[s]." *McCrory v. Henderson*, 82 F.3d 1243, 1247-48 (2d Cir. 1996) (holding that "[an attorney's] explanation that a venireperson was excluded because he or she seemed, for example, inattentive or hostile [to the attorney's client] if credible, is sufficient"). Thus, "[a]n impression of the conduct and demeanor of a prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge." *Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir.1992), *cert. denied*, 506 U.S. 1084 (1993).

As to the *Batson* third step, the Magistrate Judge credited Defendants' race neutral explanations, and this Court sees no reason to disturb that decision. The Magistrate Judge listened to Defendants' explanations for striking each prospective juror, even correcting Plaintiff counsel's mischaracterization of Defendants' counsel's words, then heard Plaintiff counsel's response. The Magistrate Judge then made a credibility determination: she explained that she did not believe that Defendants' counsel struck the prospective jurors because they were black and that he had articulated race-neutral reasons. "Given the often subtle reasons for the exercise of peremptory challenges, a court's determination of whether [an attorney] has used them in a discriminatory fashion will often turn on the judge's observations of prospective jurors and the attorneys during voir dire and an assessment of their credibility." *McCrory*, 82 F.3d at 1248 (collecting persuasive authority holding that finding of intentional discrimination largely turns on evaluation of credibility). The Magistrate Judge was in the best position to evaluate Defendants' counsel's credibility and determined that there was no intentional discrimination.

While the Magistrate Judge's statement did not provide a detailed analysis with respect to her ruling or make use of the word "credibility," the disposition is not inadequate under Second Circuit precedents as district courts "need not engage in a 'talismanic recitation of specific words' to satisfy *Batson*." *Rowell*, 830 F. App'x at 700 (quoting *Galarza v. Keane*, 252 F.3d 630, 640

n.10 (2d Cir. 2001)); *see Dolphy v. Mantello*, 552 F.3d 236, 239 (2d Cir. 2009) (a court "applying the third Batson prong need not recite a particular formula of words or mantra"). It must "somehow make clear whether it credits the . . . race-neutral explanation." *Dolphy*, 552 F.3d at 239; *see also Taylor v. Roper*, 577 F.3d 848, 865 n.7 (8th Cir. 2009) (an "implicit" "evaluation of credibility" suffices under the third *Batson* step). The Magistrate Judge made an ultimate determination that based on Defendants' counsel's race-neutral explanation, Plaintiff's counsel had failed to establish a *Batson* violation, fulfilling her obligations under *Batson* step three.[4]

Plaintiff cites only one case—*Barnes v. Anderson*, 202 F.3d 150 (2d Cir. 1999)—to support his position that the Magistrate Judge did not assess the credibility of the Defendants' proffered reason. *See* Pl.'s MOL at 5-6. But the circumstances in *Barnes* are markedly distinct from the facts of this case. In *Barnes*, as the Second Circuit noted, the trial record was "somewhat unclear" by the sequence of events that included two separate *Batson* motions by plaintiffs based on defendants' three peremptory strikes of black prospective jurors. *Barnes*, 202 F.3d at 156. After defendants exercised their strikes on two prospective jurors, plaintiffs made their first *Babson* motion, and the trial judge stated that it did not find defendants' "summary" reason pretextual. *Id.* On this first *Batson* challenge, the Second Circuit opined that "[i]f this was the extent of the *Batson* issue, then the only question before us would be whether the district court erred in finding defendants' explanation credible, a finding entitled to 'great deference[,]'" *id.*, suggesting that such ruling by the trial court did not constitute clear error and would not warrant reversal or remand. But there, it is what followed with respect to plaintiffs' second *Batson* challenge that the Second

---

[4] Plaintiff asserts that the "Magistrate Judge then erroneously stated that there were still at least two black jurors selected and that that somehow rectified the [D]efendants' violation of Batson." Pl's MOL at 5. The Court disagrees with Plaintiff's characterization of the Magistrate Judge's statement. Rather, a fair and reasonable reading of the transcript reveals that the Magistrate Judge's comment that "there are two black members who will still be on the jury" was in response to Plaintiff's counsel's specific statement that "[j]ust because you're black doesn't mean you don't get to be on a jury. This is 2025." Tr. at 75:22-76:2.

Circuit could not cloak with great deference.  Plaintiffs made their second *Batson* motion after defendants exercised their third strike.  *Id.*  After a "great deal of confusion," the trial judge stated that he "won't rule on credibility of the attorneys right now myself, but I find [both sides' strikes] have sufficient reason.  I am not stating whether or not I buy all of [the] arguments . . ." *Id.* at 157. The Second Circuit "[couldn't] square the district court's explicit refusal to rule on the credibility of either attorney's explanation with the court's duty under the third step of *Batson*." *Id.*  "The credibility of an attorney offering a race-neutral explanation is at the very heart of that analysis," the court held, and therefore concluded that "the district court erred in its application of *Batson* to plaintiffs' second motion." *Id.*

Unlike in *Barnes*, in this case the Magistrate Judge made a credibility finding.  Here, after Defendants struck three prospective jurors, Plaintiff made its *Batson* challenge; Defendants proffered their race-neutral explanations; Plaintiff disagreed with these explanations; and the Magistrate Judge stated that she did not think Defendants' counsel struck the three panelists because they are black, crediting the race neutral reasons, and overruled the *Batson* challenge.  At no point did the Magistrate Judge refuse—implicitly or explicitly—to make a credibility finding. Despite the Magistrate Judge's ruling, Plaintiff continued to press, leading Defendants' counsel to defend his character and ethics as an attorney.  Then, the Magistrate Judge, having already ruled, simply noted that the parties made their record and that the issue was preserved for appellate purposes.

Under these facts, the Court affords "great deference" to the Magistrate Judge's ruling. "That deference stems from the fact that the best evidence of the credibility *vel non* of a race-neutral explanation will often . . . be the demeanor of the attorney who exercises the challenge, and such evaluations of demeanor lie[] peculiarly within a trial judge's province," in this case the

Magistrate Judge that presided over jury selection. *Messiah*, 435 F.3d at 196 (quotation and citation omitted).

Moreover, Plaintiff's reliance on *Barnes* to seek a new trial here on the basis that the Second Circuit had ordered one in *Barnes* is inapposite. In *Barnes,* the Second Circuit noted that "[o]rdinarily in [the circumstance where there's a *Batson* violation], [it] would remand to the district court with instructions either to re-conduct the *Batson* analysis or, if the district court determined that it was no longer possible to do so effectively, to order a new trial." *Id.* at 157. However, this was not possible in *Barnes*, since the trial judge passed away in the intervening time. Specifically, the Second Circuit noted that while remand could be appropriate to another trial judge, it reasoned that "in light of the *particular* circumstances surrounding jury selection, the state of the record, and the unavailability of the trial judge," the better course was to remand for a new trial. *Id.* (emphasis added); *see id.* (it was "not confident" that *Batson* hearing on remand would "shed reliable light upon the voir dire"). Thus, a new trial was ordered in *Barnes* because the district judge did not make a credibility determination in its *Batson* analysis and could not make one following appeal because he had passed in the intervening time. By contrast, here, the Magistrate Judge made a credibility determination. Moreover, there is no evidence that the Magistrate Judge would encounter any difficulty recalling the circumstances of the jury selection, if called upon to do so, given that this trial occurred approximately three months ago. *Id.* at 156.

**B.    The Jury's Verdict Was Not Against the Weight of the Evidence**

Plaintiff's second basis for a new trial is that the jury's verdict was against the weight of the evidence.[5] In support, Plaintiff argues that "Defendants admitted their liability multiple times

---

[5] Plaintiff states that the "[C]ourt properly denied [Defendants'] motion for a directed verdict on the issue of liability[.]" Pl.'s MOL at 7. However, this is an incorrect representation of the trial record. At the close of Plaintiff's case-in-chief, Defendants move for directed verdict, and the Court reserved decision on Defendants' motion. Tr. at 634:13 (MR. DEMIRAYAK: Yes, Plaintiff rests."); *see id.* at 634:15-16 (MR. IERVASI: At this time, I would like to

by (1) admitting not looking carefully enough to avoid the crash, (2) Defendant Jean Andre's admission in response to a question by the trial judge if he lied to hide the fact he did not see the plaintiff's vehicle before the crash, (3) admissions that their vehicle was obstructing the lane of travel in violation of the Vehicle and Traffic Law [VTL], and (4) admissions that the vehicle was stopped at least 4 feet from the right curb in violation of the VTL." Pl.'s MOL at 7.  In Plaintiff's view, it was "impossible for a jury to not find liability on the Defendants under these circumstances"; the "jury had to find [Defendants] even at least 1% liable." *Id.*

A jury's verdict "is against the weight of the evidence, for purposes of a Rule 59 motion, if and only if the verdict is seriously erroneous or a miscarriage of justice." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002).  In contrast to the standards governing a Rule 50 motion, a court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner" when considering a Rule 59 motion. *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  The Court must, however, "exercise [its] ability to weigh credibility with caution and great restraint," and "'[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'" *Id.* (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)); *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 134 (2d Cir.1986) ("It has long been settled that '[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn

---

make a motion for directed verdict, your Honor."); *see id.* 639:12-13 (THE COURT: Okay, with that, the Court will take the motion under advisement and reserve decision."). Before the case was submitted to the jury for verdict, the Court did not rule on Defendants' motion.

different inferences or conclusions or because judges feel that other results are more reasonable.'" (alteration in original) (quoting *Tennant v. Peoria & Pekin Union Ry.,* 321 U.S. 29, 35(1944)).

Plaintiff's argument boils down to the jury "*had to* find liability against [Defendants] in light of the trial testimony" because the video simply "does not show the full picture of what occurred" and that "looking at the video *alone* could make anyone think [that Plaintiff] was responsible for the crash." Pl.'s MOL at 7; Pl.'s Reply at 5. The jury's "refusal" to find Defendants liable "even at least 1% liable" was "irrational," Plaintiff contends. Pl.'s MOL at 7. According to Plaintiff, his case strategy was to "explain to the jury that it should not just look at the video but look at other evidence as well to get the full picture." Pl.'s Reply at 5. In essence, Plaintiff is asking that the Court set aside the jury verdict and order a new trial on the basis that the jury did not accept his theory of the case, and that the jury should have disregarded the video, discredited Andre's testimony (except for his alleged admission of liability), and fully credited Salters' testimony (except for when he admitted liability). Thus, Plaintiff rests his entire argument for new trial on cherry-picked witness trial testimony that Plaintiff believes is favorable to him – and asserting that had the jury relied on the witness testimony it heard, a rational jury would have rendered a verdict in Plaintiff's favor, thereby speculating that because the jury found for Defendants, it must have relied solely on the video. However, the jury alone is the trier of the facts, and it is up to the jury to weigh the evidence and assess the credibility of the witnesses. Here, the jury, relying on a combination of its assessment of the witnesses' testimony and its review of the video, simply did not credit the trial testimony in the same way that Plaintiff had hoped.

Where a motion for a new trial is based on witnesses' testimony, the Second Circuit has directed district courts to rarely disturb a jury's credibility determinations because such are the exclusive province of the jury under all but the most unusual circumstances. *See DLC Mgmt.*

*Corp.*, 163 F.3d at 134 ("A court should rarely disturb a jury's evaluation of a witness's credibility."); *Raedle v. Credit Agricole Indosuez*, 670 F.3d 41, 417-18 (2d Cir. 2012) (trial judge must act "with caution and great restraint" when asked to review a jury verdict based on witnesses' credibility; the trial judge "may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge [or a party] disagrees with the jury."); *see also Elyse v. Bridgeside Inc.*, 367 F. App'x 266, 268 (2d Cir.2010) ("The district court is authorized to grant a new trial based on the weight of the evidence only if it determines that the jury's verdict was 'seriously erroneous,' or 'a miscarriage of justice.' In making its determination, however, the court must refrain from invading the province of the jury to evaluate the credibility of the witnesses.").

Here, the parties elicited inconsistencies in Andre and Salters' testimonies, some of which were favorable to Plaintiff. However, "it was well within the province of the jury to decide which testimony to rely upon in reaching its ultimate determination of liability" and it was for the jury to reconcile these inconsistencies in light of all the evidence put before it by the parties, including the video. *Frank Sloup & Crabs Unlimited, LLC v. Loeffler*, 745 F. Supp. 2d 115, 133 (E.D.N.Y. 2010). In other words, the jury was free to credit some or all of Andre and Salters' respective testimony. The jury was also not required to believe either side in terms of their testimony and could have relied on the video.

Ultimately, the jury evaluated the totality of the evidence presented at trial—the testimony of the witnesses, including Plaintiff Salters and Defendant Andre, as well as the video—and made credibility determination to resolve any conflicting testimony. As such, the Court will not step in to second guess the jury's work. *Raedle*, 670 F.3d at 418. Here, the verdict was not "seriously

erroneous or a miscarriage of justice." *Farrior*, 277 F.3d at 635.  Therefore, Plaintiff is not entitled to a new trial.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to vacate the judgment and for a new trial is denied.

**SO ORDERED.**

/s/
ORELIA E. MERCHANT
United States District Judge

May 27, 2025
Brooklyn, New York